Rigoberto YEPES–PRADO, Petitioner,

v.

U.S. IMMIGRATION AND NATURAL-IZATION SERVICE, Respondent.

No. 91–70114.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1992.

Decided Oct. 8, 1993.

As Amended Nov. 12, 1993.

John E. Ricci, Charles E. Nichol, San Francisco, CA, for petitioner.

Martin Resendez Guajardo, San Francisco, CA, substituted as counsel for petitioner.

Carl H. McIntyre, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: FERGUSON, REINHARDT, and KOZINSKI, Circuit Judges.

REINHARDT, Circuit Judge:

## I. *Factual and Procedural Background*

Rigoberto Yepes–Prado is a thirty-eight-year-old individual who was lawfully admitted to the United States as a permanent resident on November 29, 1974. He has lived here since that date and has maintained steady employment. On April 14, 1984, he was arrested for possession of 14.25 grams of heroin with intent to distribute in violation of California law. He was convicted of that charge on January 15, 1986 and sentenced to one year in the county jail and two years probation. Nothing in the record suggests that Yepes–Prado has ever been arrested for, let alone convicted of, any other criminal offense since he arrived in the United States almost twenty years ago.

On the basis of the 1986 drug conviction, the Immigration and Naturalization Service ("INS") ordered Yepes–Prado to show cause why he should not be deported under section 241 as an alien who has been convicted of a violation of a law relating to a controlled substance. 8 U.S.C. § 1251(a)(11) (1988).[1] Yepes–Prado conceded that he was eligible for deportation, but sought a discretionary waiver under section 212(c). 8 U.S.C. § 1182(c). Although an immigration judge ("IJ") found that several equities weighed in Yepes–Prado's favor, he denied the waiver. Yepes–Prado then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA found that Yepes–Prado had "outstanding equities" and was eligible for relief, but found no error in the IJ's decision. Yepes–Prado's petition for review of the BIA's decision is now before us. We have jurisdiction under 8 U.S.C. section 1105a. We vacate and remand.

## II. *The Nature of 212(c) Relief*

Section 212(c) of the Immigration and Naturalization Act allows the Attorney General to grant discretionary relief from deportation or exclusion to lawful permanent residents who, like Yepes–Prado, meet the provision's seven-year residency requirement.[2] The INS' regulations first delegate the authority to make section 212(c) decisions to the Executive Office of Immigration Review and the BIA. 8 C.F.R. §§ 3.0, 3.1(a)(1) & (d)(1) (1993). They then refer responsibility over 212(c) determinations to IJs and give appellate jurisdiction over those decisions to the BIA. § 3.1(b)(3).[3] In exercising his responsibility, an IJ must determine whether to grant section 212(c) relief based on all the facts and circumstances of a particular case, taking into account the social and humane considerations presented in an applicant's fa-

---

**1.** The Immigration Act of 1990, Nov. 29, 1990, Pub.L. 101–649, 104 Stat. 4978, renumbered and amended portions of Title 8 U.S.C. However, those amendments do not apply to proceedings such as Yepes–Prado's which began before the effective date of the amendments.

**2.** The provision states:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under any order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted at the discretion of the Attorney General.

By its terms, this section applies only to person seeking readmission but the INS and this circuit have held that relief under this provision is also available in deportation proceedings. *See, e.g., Matter of Silva,* 16 I & N Dec. 26 (BIA 1976); *Charlesworth v. INS,* 966 F.2d 1323, 1325 (9th Cir.1992).

**3.** A 212(c) application may also be submitted to the appropriate district director. 8 C.F.R. § 212.3(a)(1). The application may then be resubmitted to an IJ. § 212.3(c).

vor and balancing them against the adverse factors that evidence the applicant's undesirability as a permanent resident. *In re Edwards,* Interim Decision No. 3134, 1990 WL 385757, 1990 BIA Lexis 8, *9.

The BIA has enumerated several factors to be considered in determining whether or not to grant a section 212(c) petition. Favorable considerations include: 1) family ties within the United States; 2) residence of long duration in this country (particularly when residence began at a young age); 3) hardship to the petitioner or petitioner's family if relief is not granted; 4) service in the United States armed forces; 5) a history of employment; 6) the existence of business or property ties; 7) evidence of value and service to the community; 8) proof of rehabilitation if a criminal record exists; 9) other evidence attesting to good character. *Id.* at 10–11. To be weighed against these factors are 1) the nature and underlying circumstances of the exclusion or deportation ground at issue; 2) additional violations of the immigration laws; 3) the existence, seriousness, and recency of any criminal record; 4) other evidence of bad character or the undesirability of the applicant as a permanent resident. *Id.* at 11. Where a 212(c) petitioner has committed a particularly grave criminal offense, he must make a heightened showing that his case presents unusual or outstanding equities to warrant discretionary relief. *Id.* at 11–12. However, there are cases in which the adverse considerations are so serious that a favorable exercise is not warranted even in the face of unusual or outstanding equities. *Id.* at 12.

III. *The Scope and Standard of Review*

 The BIA has the power to review the factual and legal basis of an IJ's 212(c) decision *de novo. Charlesworth v. INS,* 966 F.2d 1323, 1325 (9th Cir.1992). However, our review is more circumscribed. We review agency fact-finding to see if it is supported by substantial evidence, *Martinez v. INS,* 970 F.2d 973, 974 (1st Cir.1992), and the balancing of the equities underlying a 212(c)

determination for an abuse of discretion. *Vargas v. INS,* 831 F.2d 906, 908 (9th Cir. 1987). We also review agency decisions for errors of law. Moreover, an error of law also constitutes an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990).

 The agency abuses its discretion if it fails to state its reasons and show proper consideration of all factors when weighing equities and denying relief. *Cerrillo–Perez v. INS,* 809 F.2d 1419, 1422 (9th Cir.1987). A denial of relief may be affirmed only on the basis articulated in the agency's decision and we cannot assume that the INS considered factors that it failed to mention. *Mattis v. INS,* 774 F.2d 965, 967 (9th Cir.1985). Moreover, the inclusion of an improper factor in reaching a discretionary decision is ordinarily grounds for remand. *Braun v. INS,* 992 F.2d 1016, 1021 (9th Cir.1993); *Je Hung Ng v. INS,* 804 F.2d 534, 538–39 (9th Cir.1986).

 As an initial matter, the parties disagree as to the decision that we should review in this case. Yepes–Prado argues that we should look primarily to the ruling of the IJ. The INS contends that our examination should be confined to the BIA's opinion. The government correctly states the general rule that where the BIA engages in *de novo* review of the IJ's factual and legal determinations, we consider only the decision of the BIA because any errors made by the IJ will be rendered harmless. *See Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991); *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1002 (9th Cir. 1988). However, that principle is not dispositive here because the BIA did not engage in *de novo* review of the IJ's decision. The BIA stated that the question raised by Yepes–Prado's appeal was whether the IJ had abused his discretion in denying him relief. After reviewing the IJ's decision and Yepes–Prado's equities, the BIA upheld the IJ's determination because it could not state that the IJ's "decision to deny 212(c) relief in the exercise of discretion was error, as a matter of law." [4] Nowhere did the BIA state that it

4. The meaning of this standard is not self-evident. We think that in all likelihood the BIA was stating that it would not overturn the IJ's denial of relief unless the only reasonable conclusion was that Yepes–Prado's application should have

was subjecting the IJ's decision to *de novo* review, that is was conducting its own examination of the record, or, most important, that it was exercising discretion independently. *Cf. In Re Coelho*, Interim Decision No. 3172, 1992 WL 195806, 1992 BIA Lexis 7; *Edwards*, 1990 WL 385757, 1990 BIA Lexis 8 at *13.

As the Seventh Circuit recently stated, there is a significant difference between the BIA's evaluation of an IJ's 212(c) determination under the abuse of discretion standard and its performance of a *de novo* review. *Ortiz–Salas v. INS*, 992 F.2d 105, 108 (7th Cir.1993). In the latter situation the BIA makes an independent judgment as to whether it agrees with the IJ's balancing of the equities and determines, in the exercise of its own discretion, whether to reach the same result.[5] *See id.* In contrast, when the BIA reviews for an abuse of discretion it accepts determinations with which it may well not agree, as well as results it might not have reached. *Id.; see also* Steven Alan Childress & Martha S. Davis, *Federal Standards of Review*, § 15.02 at 15–2 through 15–3 (2d ed. 1992) (characterizing *de novo* review as agreement review with no tolerance for error and review for abuse of discretion as review for a possibly correct decision with a high tolerance for risk of error). The distinction is not merely formalistic. Where the BIA reviews an IJ decision regarding 212(c) relief *de novo*, it is the Board that makes the discretionary judgment to grant or deny relief. Where the BIA's review is for an abuse of discretion, the decision is left to the IJ, subject to only limited oversight. *See Ortiz–Salas*, 992 F.2d at 108.

As stated earlier, we review the ultimate determination whether to grant 212(c) relief under an abuse of discretion standard. We

do so because it is the Attorney General, not the federal courts, that is charged with making the decision whether to grant a petitioner relief from deportation or exclusion. The type of review the BIA performs should similarly reflect a prior agency determination as to where the decisionmaking authority regarding 212(c) cases is located within the Executive Office for Immigration Review. It appears, however, that the BIA has no fixed situs for the basic discretionary determination and thus no fixed standard for reviewing decisions by IJs on 212(c) applications. *Ortiz–Salas*, 992 F.2d at 107. We agree with Judge Posner that it is "irresponsible" of the BIA not to have defined the proper allocation of discretionary authority over 212(c) petitions and instead to require those who appear before it to guess which standard of review it will apply (or even has applied) on a particular occasion. *Id.*[6]

Until the BIA sees fit to fix its standard of review, we are left with the problem of deciding in each case which decision we must examine for an abuse of discretion: the IJ's or the BIA's. Because in this case the Board did not determine the propriety of 212(c) relief for itself but merely determined that the IJ had not abused his discretion in denying Yepes–Prado's application, it is the exercise of the IJ's discretion and, therefore, his decision that we must review.

IV. *The Immigration Judge's Decision Constituted an Abuse of Discretion*

A. *In Denying Relief The Immigration Judge Improperly Relied Upon the Fact Yepes–Prado is not Married to the Mother of his Children.*

■ In his oral decision the IJ stated that Yepes–Prado had "demonstrated ... anti-

---

been granted. In any event, it is clear that the BIA's review was deferential.

**5.** Actually, the term *"de novo* review" is something of a misnomer. To consider a matter *de novo* is to determine it anew, as if it had not been heard before and no decision had been rendered. *Ness v. C.I.R.*, 954 F.2d 1495, 1497 (9th Cir. 1992). Properly defined, *de novo* treatment comprehends a new hearing. However, when *we* refer to *de novo* review, we refer, colloquially, to the fact that we do not defer to any degree to the lower court ruling or agency decision in question.

**6.** Judge Posner expressed his views regarding the INS' performance in varying ways but always to the same effect. In addition to terming the Board "irresponsible", he noted that it "ha[d] not covered itself with glory" and was unable to make up its mind as to how to handle 212(c) applications. He described the legal position that the BIA could have no fixed standard of review in this area as "astonishing" and "incoherent" *Id.* at 107–08.

social behavior by fathering another child ... out of wedlock" since his release from prison. The IJ believed that this conduct diminished any showing of rehabilitation. At the same hearing the IJ stated point-blank to Yepes–Prado's lawyer that he had already told Yepes–Prado that:

> his case was going to be a difficult one to grant relief in in view of the fact that he is not married to the mother of his children—in view of the fact that his children are really illegitimate, children, not even his own legitimate children. This was a negative factor in his case....

The IJ was also extremely displeased that Yepes–Prado had not followed his orders to legalize his relationship. The IJ complained:

> And, he was told by me, last time, to regularize his relationship with a woman, by whom he he's had three children and a fourth on the way, and he come's back single.[7]

Much later in the proceedings when Yepes–Prado testified that he participated in church events, the IJ cross-examined him as to why he did not follow the Church's marriage rules:

> Q. Doesn't the Catholic Church also teach you that you [sic] supposed to be married before you start having children?
>
> A. Yes.
>
> Q. How come you didn't follow those rules?
>
> A. I'd like to follow it but the woman she's got a bad temper ... sometimes she's in agreement to do it and then the next time I know she doesn't want to do it.
>
> Q. But you didn't follow it from the beginning.

There is no question that the IJ gave significant weight to the fact that Yepes–Prado and the mother of his children, Maria Saavedra, were not married. The IJ's consideration of this factor fails to meet the requirement that denials of discretionary relief be supported by "reasoned explanation

based on *legitimate* concerns." *Vargas v. INS*, 831 F.2d 906, 908 (9th Cir.1987) (emphasis added). Yepes–Prado's unwed parent status cannot be used to support a finding of lack of rehabilitation, as the IJ suggested, nor is it otherwise a permissible basis for establishing bad character or undesirability as a permanent resident. *See Matter of Andrade*, Interim Dec. No. 3037, 1987 BIA Lexis *9–10 (Board Member Heilman, concurring) ("character" does not include personal living arrangements); *see also Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion) (freedom of personal choice in matters of marriage and family life is liberty protected by Due Process Clause).

■ The same is true with respect to the fact that Yepes–Prado and Saavedra continued to maintain a sexual relationship out of wedlock. Private sexual conduct between consenting adults cannot be considered as a negative factor in an INS proceeding, at least absent specific congressional authorization. *Cf. Hampton v. Mow Sun Wong*, 426 U.S. 88, 103–05, 96 S.Ct. 1895, 1905–06, 48 L.Ed.2d 495 (1976) (Civil Service Commission violated Due Process by excluding noncitizens from federal civil service without express command from Congress or President). It has long been recognized that private consensual sexual activity is an important aspect of personal identity. *See Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687–88, 97 S.Ct. 2010, 2017–18, 52 L.Ed.2d 675 (1977). Government inquiries into that area are highly intrusive, and we will not readily infer that Congress delegated to the Executive Branch the power to inquire into or penalize any such activities absent specific statutory language to that effect.[8] *See Kent v. Dulles*, 357 U.S. 116, 129–30, 78 S.Ct. 1113, 1119–20, 2 L.Ed.2d 1204 (1958). The grants of discretionary authority to the Attorney General in 212(c) and

---

7. This statement is factually inaccurate. Maria Saavedra was pregnant with Yepes–Prado's third not fourth child.

8. The Act's provision that persons who have engaged in or intend to engage in prostitution are

excludable shows that when Congress intends to permit the INS to take a particular form of sexual conduct into account, it can easily make that intent explicit. 8 U.S.C. § 1182(a)(2)(D).

other similar provisions of the Immigration and Naturalization Act are far too general to permit a conclusion that Congress intended to authorize making private sexual conduct between consenting adults a basis for deportation or exclusion from this country.[9]

There is no reason for us to reach the question of the constitutionality of punitive government action based on private sexual conduct between consenting adults. *Kent* is not limited to cases involving constitutional violations. *See* 357 U.S. at 129, 78 S.Ct. at 1119. Its rule of narrow construction applies where activities important to personal well-being are involved. The policies underlying *Kent* render it applicable where legislation affects a fundamentally sensitive area. The specific practice in question need not itself be constitutionally protected.[10]

We are particularly reluctant to find implied authority to inquire into and "punish" private consensual sexual conduct in light of the fact that Congress has removed from Title 8 the three provisions that had previously penalized certain forms of that activity.[11] In 1981 Congress repealed the statutory subsection that provided that adultery disqualified an applicant from being found to possess good moral character. Pub.L. 97–116, § 2(c), Dec. 29, 1981, 95 Stat. 1611, repealing 8 U.S.C. § 1101(f)(2). More significant, Congress has eliminated the statutory ground for exclusion based on "sexual deviancy". Section 601 of the Immigration Reform Act of 1990, Pub.L. 101–649, Nov. 29, 1990, 104 Stat. 4978, 5067, codified at 8 U.S.C. § 1182(a). The legislative history of the Act described the eliminated ground as "being out of step with current notions of privacy and personal dignity." House Rep. No. 723(I), 101st Cong., 2d Sess., p. 56, 1990 U.S.C.C.A.N. 6710, 6736. The Immigration Reform Act also removed polygamy as a ground of exclusion. As a whole, these changes evidence Congress's intent that private sexual conduct among consenting adults should no longer be considered a legitimate basis for making immigration decisions.[12]

9. Our recent decision in *United States v. Chen*, 2 F.3d 330, 333–34 (9th Cir.1993) is not applicable here. *Chen* held that the Attorney General could augment the authority of the INS by delegating to the agency general law enforcement powers granted to her directly. Here, Congress has not given the Attorney General the authority to consider private sexual conduct. The expansive view of agency authority implicit in *Chen* is inappropriate where the power at issue is not merely unspecified but calls for an intrusion into fundamental rights, personal identity, or well-being.

10. We do not consider the question of what type of authorization is required in the case of the military, and express no view on that issue. We note, however, that in some respects the military is treated differently than other organs of government, even where constitutional rights are involved. *See, e.g., Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (Air Force may prohibit officer from wearing yarmulke while on duty).

11. We use "punish" and "punitive" in a broad, not a technical sense. *Cf. INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) (deportation is purely civil and not intended as punishment) As used herein it means to impose severe adverse consequences on a person for conduct of which the government disapproves. Few punishments are more drastic than expelling persons from this country when their family members are residents. As the Sixth Circuit aptly stated, "Deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty." *Gonzalez v. INS*, 996 F.2d 804, 811 n. 7 (6th Cir.1993) (internal quotation and citation omitted).

12. We recognize that a brief reference in the 1981 House Report to the repeal of the adultery provision indicated that adultery could still be taken into account in finding a lack of "good moral character". House Rep. No. 264, 97th Cong. 1st Sess., p. 19, 1981 U.S.C.C.A.N. 2588. However, the 1990 amendments reflect a superceding Congressional view that private consensual sexual conduct is no longer relevant to immigration decisions. In addition to stressing its views regarding "privacy and personal dignity," the House Report for the Reform Act stated that the amendments demonstrate "that the United States does not view personal decisions about sexual orientation as a danger to other people in our society." 1990 U.S.C.C.A.N. at 6736. We think it most unlikely that Congress would have chosen to emphasize considerations of privacy and dignity in determining that homosexual conduct is irrelevant to immigration decisions and at the same time continue to permit governmental inquiries into an individual's heterosexual "affairs" so that heterosexuals may be excluded or deported on the ground of a lapse in marital fidelity. Under the circumstances, we give no weight to the isolated references in House Rep. No. 264.

■ That the private sexual conduct involved here led to the birth of children does not affect this result. A family relationship is to be counted as a positive factor in determining whether to grant 212(c) relief. *Edwards*, 1990 WL 385757, 1990 BIA Lexis 8 at *10. Under 8 U.S.C. section 1101(b) the relationship between parents and their "illegitimate" children is such a relationship.[13] Congress could not have intended that a parent's relationship with an illegitimate child constitute a positive factor favoring the grant of relief while at the same time authorizing the use of that same relationship as a negative factor supporting the denial of relief. The IJ's decision to treat as an adverse factor the fact that Yepes–Prado is a parent of "illegitimate" children is thus wholly inconsistent with Congressional and BIA policy.[14]

■ Moreover, the IJ's error in this case was particularly egregious. Although the IJ credited Yepes–Prado's testimony that he wanted to marry Saavedra, the mother of his children, the IJ considered her wish to remain unmarried as an adverse factor supporting the denial of discretionary relief to Yepes–Prado. This makes no sense at all. The fact that Saavedra was for whatever reason unwilling to enter into a formal state of matrimony with Yepes–Prado was wholly irrelevant to any determination as to Yepes–Prado's character and to any other matter pertinent to his application for relief from deportation.

In sum, by considering the irrelevant factors of the legal status of Yepes–Prado's relationship with Saavedra and her refusal to marry him, as well as the "illegitimacy" of Yepes–Prado's children, the IJ based his decision on unreasonable and improper factors rather than on legitimate concerns about the administration of the immigration laws. *See Mattis*, 774 F.2d at 969. In short, the IJ abused his discretion egregiously. Accordingly, the BIA erred in deferring to his ruling, and we are required to vacate the Board's decision. *Ng*, 804 F.2d at 538–39.

**B. *The IJ Erred in Failing to Consider the Particular Facts of Yepes–Prado's Drug Conviction***

■ There is another fundamental error on the part of the IJ that requires vacation of the BIA's decision. We base our decision on each ground independently.

■ In making a discretionary immigration decision, the agency must indicate "how it weighed the factors involved" and "how it arrived at its conclusion." *See Dragon v. INS*, 748 F.2d 1304, 1307 (9th Cir.1984). Without such an explanation, a reviewing court cannot tell whether the IJ or BIA has departed from established policies in deciding a particular 212(c) application and thereby abused its discretion. *See Israel v. INS*, 785 F.2d 738, 740 (9th Cir.1986) (BIA acts arbitrarily when it disregards its own precedents and policies without giving a reasonable explanation for doing so). While agencies must have significant flexibility to adapt their practices to meet changed circumstances or the facts of a particular case, they cannot reach their decisions capriciously. Agencies abuse their discretion no less by arriving at plausible decisions in an arbitrary fashion than by reaching unreasonable results.[15] In this case, the IJ did not properly evaluate the factors involved and failed to offer a *reasoned* explanation of why the only adverse factor, the single drug conviction, outweighed all of the equities in Yepes–Prado's favor.[16]

---

13. A father of an illegitimate child must show a bona-fide parent-child relationship. § 1101(b)(1)(D). Here, it is undisputed that such a relationship exists and that Yepes–Prado provides substantial economic support for his children.

14. We note that the BIA did not endorse the IJ's reliance upon these factors when it reviewed his decision. This further indicates the inappropriateness of the considerations upon which the IJ took into account in rendering his decision.

15. For example, if the agency has consistently given one factor preeminent weight in its decisionmaking, it cannot choose to give it absolutely no weight in a particular case without explaining its reasons for doing so. *Israel*, 785 F.2d at 740 n. 1 (quoting *Sang Seup Shin v. INS*, 750 F.2d 122, 124–25 (D.C.Cir.1984)).

16. The equities involved included Yepes–Prado's lack of any previous criminal history, his long-term residency, his strong family ties to the United States (including his residence with his seven-

Congress has decided that certain drug offenders are categorically barred from obtaining 212(c) relief. Sections 501(a) and 511(a) of the Immigration Act of 1990, Pub.L. 101–649, Nov. 29, 1990, 104 Stat. 4978, 5048, 5052, codified at 8 U.S.C. sections 1101(a)(43) & 1182(c), make persons who have been convicted of serious drug crimes ineligible for 212(c) relief *if* they have served at least five years in prison for those offenses. Congress could have decided to deny discretionary relief to all persons convicted of serious drug offenses, but it explicitly chose not to do so. Instead, by providing that 212(c) relief will remain available to persons such as Yepes–Prado, who have served less than five years imprisonment on account of a narcotics conviction, Congress demonstrated its intent that the Attorney General should consider these applications on a case by case basis, while carefully weighing all pertinent considerations, including the particulars of the petitioner's criminal conduct. Here, it appears from the record that the IJ may have denied relief in large part on the basis that Yepes–Prado committed a crime involving drugs.

■ The Eleventh Circuit has held in a deportation proceeding involving a narcotics conviction that the agency "must evaluate the nature and underlying circumstances of [an] applicant's conviction in order to determine the weight it should accord to this adverse factor." *Martinez–Benitez v. INS*, 956 F.2d 1053, 1055 (11th Cir.1992). In short, the agency must examine the facts surrounding the precise offense and evaluate those circumstances before determining the weight to be afforded a particular drug conviction. In *Martinez–Benitez*, the court reversed the

BIA for failing to take into account the IJ's finding that the applicant possessed only about half the quantity of cocaine alleged in the indictment to which he had pleaded guilty. *Id.* at 1055–56. We need not go as far as the Eleventh Circuit here. For present purposes, we need hold only that convictions, including drug convictions, must be considered on an individual basis rather than in a blanket fashion. The IJ or the BIA must, as part of the balancing process required by *Edwards*, consider the relative seriousness of the particular conduct of which the petitioner was convicted. Here, the IJ, for the most part, merely offered general observations that appear to be applicable to drug offenses in general.[17]

■ We stress that it is the agency's responsibility to decide the proper weight to give the various factors involved in 212(c) petitions involving narcotics offenses. What it may not do is categorically deny 212(c) relief to drug offenders who have served less than five years incarceration. In this context we note with approval the Sixth Circuit's recent comments in *De Gonzalez v. INS*, 996 F.2d 804, 810–11 (6th Cir.1993). There, the INS was asked to provide the court with cases in which 212(c) discretion was exercised by the BIA in favor of a petitioner convicted of a serious drug offense. The INS was able to produce only *one* such decision. The Sixth Circuit found that this data strongly suggested an unauthorized policy of not granting 212(c) relief in drug cases. *Id.* at 810. We agree that if the agency has an unwritten policy of denying 212(c) relief where drugs are involved, it is an impermis-

---

ty-five-year-old mother and the lawful presence of five of his siblings), his support of his three United States citizen children, his continuous employment, and the affidavits from responsible community representatives attesting to his good character. The BIA held these factors to be "outstanding equities". *See infra* p. 1372.

17. It is true that the IJ in the next to last sentence of his five page oral decision identified the adverse factor (and the offense conduct) as possession of heroin for sale. However, this conclusory reference to the general offense is, in the absence of further explication, inadequate given the small amount involved and the outstanding equities in Yepes–Prado's favor. We note that

the BIA also failed to give particularized consideration to Yepes–Prado's drug conviction. While it discussed at some length the "harmful" and "pernicious" effects of drugs in general, it, too appears not to have considered Yepes–Prado's conduct in particular. At oral argument the INS contended that the fact that Yepes–Prado's conviction was for selling heroin, as opposed to another drug, was the basis of the BIA's denial of 212(c) relief. Without deciding whether the identification of the contraband itself would have been sufficient (and we again note that the amount involved was relatively small) we conclude that a fair reading of the BIA's decision would not support counsel's argument. Moreover, it is the IJ's decision not the BIA's with which we are concerned.

sible contravention of Congressional policy and is inconsistent with the Attorney General's duty to evaluate 212(c) applications on a case by case basis. It follows, of course, that an individual IJ can neither enforce such an agency policy nor implement one of his own by denying relief simply because a petitioner is a drug offender.

Because the IJ failed to evaluate Yepes–Prado's drug conviction properly and failed to offer a reasoned explanation of why that conviction outweighed all the equities in Yepes–Prado's favor, he abused his discretion, and vacation of the BIA's decision upholding his discretionary ruling is required. *See Cerrillo–Perez*, 809 F.2d at 1422; *Dragon*, 748 F.2d at 1307.

## V. *The BIA Committed Additional Errors by Inexplicably Employing a Method of Analysis It Abandoned in* Edwards *and by Failing to Give Proper Consideration to Evidence of Rehabilitation.*

Given the BIA's deferential review, we are required to vacate and remand its decision because of the various flaws in the IJ's ruling. Had the BIA's deference to the IJ's erroneous analysis been the sole error it committed in this case, we would not need to consider the opinion of the BIA itself. However, the BIA made additional factual findings and employed a different mode of analysis than the IJ, even though it did not engage in a *de novo* review of his decision.[18] In the course of this peculiar process, it made additional errors. To avoid a repetition of these errors on remand, we will address them at this point.

 Unlike the IJ, the BIA explicitly found that Yepes–Prado *had* established "outstanding equities". However, it then concluded that they "only satisfy the threshold test for consideration of a favorable exercise of discretion" and proceeded to deny him relief from deportation. In doing so, the BIA erred in several ways. First, the BIA described its analytical approach in a manner that it explicitly abandoned in *Edwards*. In *Edwards*, the Board decided that the concept that outstanding equities "satisfy only the threshold test for consideration of a favorable exercise of discretion" was misleading because it might be read to imply that a full examination of the alien's equities may somehow be pretermitted. 1990 WL 385757, 1990 BIA Lexis 8 at *13 n. 3. Here, the BIA made no mention of any desire to modify or abandon *Edwards*. In fact, it cited *Edwards* with approval. Therefore, we can only assume that the BIA made an inadvertent error when it set forth a pre-*Edwards* analytical approach.

 Second, the BIA improperly concluded that the record was "devoid of evidence of ... rehabilitation." The BIA appears to have ignored the fact that rehabilitation can be established by the absence of subsequent criminal conduct—and, that is what the evidence before the BIA demonstrated here. Yepes–Prado had been incarcerated for eight months and was released on probation; there was no evidence that he violated his probation, nor was there any evidence that he committed any criminal acts subsequent to his 1986 conviction. In addition, Yepes–Prado attended a rehabilitation program and submitted affidavits from several individuals in his community attesting to his current good character.[19]

---

**18.** This somewhat schizophrenic practice may result in improper consideration of a 212(c) petition. The IJ's decision to grant or deny discretionary relief must be based upon the IJ's weighing of all the relevant factors in a particular case. If the facts found by the BIA differ in significant respects from those that the IJ has found, then it cannot give deference to the balance struck by the IJ, which, by definition, was based on a different set of considerations. In such a case the Board either must make a *de novo* determination of the appropriateness of 212(c) relief or must remand the matter to the IJ for reconsideration. *See Cortes–Castillo v. INS*, 997 F.2d 1199, 1203 (7th Cir.1993) (where BIA is given information unavailable to the IJ, it should reexamine

the equities and reevaluate the case) (internal citation omitted). To the extent that *Hazzard v. INS*, 951 F.2d 435, 440 (1st Cir.1991), holds that there is no contradiction in the Board's current practice, we disagree.

**19.** The BIA's failure to consider any of this pertinent evidence may be due in part to its lack of discernible standards regarding what constitutes rehabilitation. In order for us to give meaningful review to a finding regarding rehabilitation, we must understand what factors the INS considers in making such a determination. Obvious considerations might include the lack of commission of any additional crimes; enrollment in and attendance at rehabilitation programs; state-

While the BIA has held that rehabilitation is not a prerequisite to 212(c) relief, *Edwards*, 1990 BIA Lexis 8 at *13, here it concluded that rehabilitation *"must ... be taken into consideration, given the seriousness of respondent's criminal conviction."* (emphasis added). *See also Matter of Roberts*, Interim Dec. No. 3148, 1991 WL 353515, 1991 BIA Lexis 9 (where deportable criminal offense is recent and serious, firm showing of rehabilitation required and lack of rehabilitation may be considered as an adverse factor). If the Board intends to treat a failure to make a showing of rehabilitation as an adverse factor in cases such as this, it must recognize that the limited amount of time between release from incarceration and the initiation of deportation proceedings may make it virtually impossible for petitioners to demonstrate that they have been rehabilitated. Frequently, petitioners may be unable to do much more than offer their own testimony that they have not engaged in further criminal conduct. *See id.* (Board Member Heilman concurring in part and dissenting in part). Requiring greater proof of rehabilitation in cases brought soon after a petitioner's release from incarceration may have the same effect as a refusal to exercise discretion in those cases, and may be violative of the Act. In any event, in Yepes–Prado's case, as we have noted, the BIA's conclusion that the record was devoid of evidence of petitioner's rehabilitation is simply incorrect.[20]

As the BIA found, Yepes–Prado has "outstanding equities" that militate in favor of a grant of relief from deportation. Although he was convicted of one drug-related offense, he had no criminal convictions or arrests prior to that crime, nor, as far as the record reflects, has he engaged in any subsequent criminal conduct. Neither the IJ nor the BIA identified any other adverse factors in the record. Thus, on remand, the agency must decide whether, standing alone, the act of which Yepes–Prado was convicted is so grave that, despite the outstanding equities that favor the grant of discretionary relief, he must be deported. If so, it must provide a reasoned explanation for that decision.

## VI. *Conclusion*

We **VACATE** the BIA's denial of Yepes–Prado's petition and **REMAND** to the BIA for further proceedings consistent with this opinion. This panel will retain jurisdiction over any further proceedings or any further petitions that may be filed in this matter. **VACATED AND REMANDED.**

---

ments of remorse; and letters of good character. The salience and weight of these and other factors may vary from case to case, but where some of these factors exist, the Board must offer more than a bald statement that there is no evidence of rehabilitation.

**20.** The BIA's finding of no rehabilitation cannot be treated as an implicit determination that Yepes–Prado's evidence of rehabilitation was not credible. The rule is that where the BIA is silent on credibility but explains the rationale for its decision, it is presumed to have found the petitioner credible. *Damaize–Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986).